1
2
3
4
5
6                          UNITED STATES DISTRICT COURT

7                               DISTRICT OF NEVADA

8                                      * * *

9    JOHN DEATHERAGE,                          Case No. 3:16-cv-00206-MMD-VPC

10                            Plaintiff,
        v.                                                    ORDER
11
     SCHINDLER ELEVATOR
12   CORPORATION, ABC CORPORATIONS,
     1 – 10 and JOHN DOES 1 – 10,
13
                             Defendants.
14

15

16   **I.    SUMMARY**

17          This case arises from an incident where Plaintiff John Deatherage ("Deatherage")

18   suffered back injuries after an elevator allegedly descended several floors rapidly and

19   then abruptly stopped. Before the Court is Defendant Schindler Elevator Corporation's

20   ("Schindler") Motion for Summary Judgment ("Motion") (ECF No. 38). The Court has

21   reviewed Plaintiff's response (ECF No. 39) and Defendant's reply (ECF No. 40). For the

22   reasons discussed herein, Schindler's Motion is granted in part and denied in part. It is

23   granted with respect to Deatherage's claim against Schindler for negligence as a

24   common carrier and is denied in all other respects.

25   **II.   BACKGROUND**

26          The following facts are taken from the complaint.[1] (ECF No. 1.)

27          ─────────────
            [1]While Defendant includes more factual details in its Motion, the Motion does not
28   dispute the facts as alleged in the Complaint and instead appears to impugn
     Deatherage's credibility. (ECF No. 38 at 2-4, 7.)

On July 19, 2014, while Deatherage and his nephew were riding in an elevator at Harvey's Lake Tahoe Resort and Casino ("Harvey's"), the elevator purportedly dropped rapidly before violently coming to a stop. As a result, Deatherage claims he sustained pre-impact terror, severe and permanent back injury, extreme pain to his groin and leg, as well as continuing physical pain and emotional distress including loss of enjoyment of life. Deatherage claims he then received multiple epidural injections, physical therapy, and eventually spinal fusion surgery, to treat his back pain.

At the time of the incident, Schindler provided preventative maintenance to the elevators located at Harvey's premises pursuant to an agreement with Harvey's.

Deatherage asserts three claims for relief against Schindler: (1) negligence for failure to exercise reasonable care so as to ensure the safety of Harvey's guests and other users of the elevators located at Harvey's; (2) negligence as a common carrier for failure to exercise the highest degree of care; and (3) res ipsa loquitur. Deatherage also alleges that Schindler acted with reckless disregard of human safety, "constituting malice under NRS [§] 42.005(1)," which entitles him to an award of punitive damages. (ECF No. 1 at 4.)

### III.    LEGAL STANDARD

The purpose of summary judgment is to avoid unnecessary trials when there is no dispute as to the facts before the court. *Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471 (9th Cir. 1994). Summary judgment is appropriate when the pleadings, the discovery and disclosure materials on file, and any affidavits show "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 (1986). An issue is "genuine" if there is a sufficient evidentiary basis on which a reasonable fact-finder could find for the nonmoving party and a dispute is "material" if it could affect the outcome of the suit under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). Where reasonable minds could differ on the material facts at issue, however, summary judgment is not appropriate. *See id.* at 250-51. "The amount of

1    evidence necessary to raise a genuine issue of material fact is enough 'to require a jury

2    or judge to resolve the parties' differing versions of the truth at trial.'" *Aydin Corp. v.*

3    *Loral Corp.*, 718 F.2d 897, 902 (9th Cir. 1983) (quoting *First Nat'l Bank v. Cities Service*

4    *Co.*, 391 U.S. 253, 288-89 (1968)). In evaluating a summary judgment motion, a court

5    views all facts and draws all inferences in the light most favorable to the nonmoving

6    party. *Kaiser Cement Corp. v. Fishbach & Moore, Inc.*, 793 F.2d 1100, 1103 (9th Cir.

7    1986).

8         The moving party bears the burden of showing that there are no genuine issues

9    of material fact. *Zoslaw v. MCA Distrib. Corp.*, 693 F.2d 870, 883 (9th Cir. 1982). "In

10   order to carry its burden of production, the moving party must either produce evidence

11   negating an essential element of the nonmoving party's claim or defense or show that

12   the nonmoving party does not have enough evidence of an essential element to carry its

13   ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co., Ltd v. Fritz Cos.,*

14   *Inc.,* 210 F.3d 1099, 1102 (9th Cir. 2000). Once the moving party satisfies Rule 56's

15   requirements, the burden shifts to the party resisting the motion to "set forth specific

16   facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256. The

17   nonmoving party "may not rely on denials in the pleadings but must produce specific

18   evidence, through affidavits or admissible discovery material, to show that the dispute

19   exists," *Bhan v. NME Hosps., Inc.*, 929 F.2d 1404, 1409 (9th Cir. 1991), and "must do

20   more than simply show that there is some metaphysical doubt as to the material facts."

21   *Orr v. Bank of Am.*, *NT & SA*, 285 F.3d 764, 783 (9th Cir. 2002) (internal citations

22   omitted). "The mere existence of a scintilla of evidence in support of the plaintiff's

23   position will be insufficient." *Anderson*, 477 U.S. at 252.

24   **IV.    DISCUSSION**

25        Schindler argues that it is not a common carrier, Deatherage cannot establish

26   negligence through the doctrine of res ipsa loquitur and because he has not

27   demonstrated causation, and Deatherage cannot establish entitlement to punitive

28   damages. The Court will address each argument in turn.

### A.   Common Carrier Negligence

Under Nevada law, a common carrier of passengers must "exercise the highest degree of care that human judgment and foresight are capable of to make his passenger's journey safe." *Forrester v. Southern Pac. Co.*, 134 P. 753, 774 (Nev. 1913). Here, Deatherage alleges that Schindler, in "inspecting, servicing and maintaining the elevators at [Harvey's], and in determining whether to warn guests and other users of the risks attendant to the use of the elevators," was a common carrier under Nevada law and, as such, was required to exercise the highest degree of care. (ECF No. 1 at 4-5.) The Court disagrees and finds that Schindler was acting merely as an independent contractor,[2] not a common carrier, and therefore owed no heightened duty of care.

Schindler contends that Nevada law has held only an elevator *owner* to be a common carrier for purposes of tort liability. (*See* ECF No. 38 at 9.) In response, Deatherage asserts that Nevada law has found that the responsibility a defendant has over the maintenance and inspection of an elevator determines whether the defendant is considered a common carrier. (ECF No. 39 at 17-18 (citing *Smith v. Odd Fellows Bldg. Ass'n*, 206 P. 796 (Nev. 1922).)[3] However, this is a misstatement of law. While it is true that the Nevada Supreme Court has found an owner of a building that operates the

---

[2]The Nevada Supreme Court has found that a company providing elevator maintenance work to a building owner, where that maintenance work is not part of the building owner's normal business operations, qualifies as an independent contractor under state law. *See Meers v. Haughton Elevator, a Div. of Reliance Elec. Co.*, 701 P.2d 1006 (Nev. 1985). Moreover, Schindler describes itself as an independent contractor in its reply. (*See* ECF No. 40 at 6.)

[3]Deatherage also states that the "issue of the delegation of common carrier liability was addressed in an unpublished case in which [Schindler] was a defendant." (ECF No. 39 at 18 (citing *Hughes v. Ethel M. Chocolates, Inc.*, No. 2:13-CV-00142-RCJ, 2013 WL 1792172 (D. Nev. Apr. 25, 2013).) However, in *Hughes* the plaintiffs did not allege that Schindler was negligent as a common carrier. By contrast, the discussion of common carriers came up only in the context of the plaintiffs' citation to *Smith*. The plaintiffs in *Hughes* cited the case in support of their contention that the duty to maintain an escalator is nondelegable. In response, the court stated that, "*Smith* did not determine whether a building owner cannot transfer its duty to repair or maintain elevators to a *tenant*, but only that the owner/operator of an elevator has a duty of care as a common carrier." *Hughes*, 2013 WL 1792172, at *5 (emphasis added). Schindler is not a tenant in this case; rather it is an independent contractor that serviced and maintained the elevators at Harvey's.

elevators within its building to be a common carrier for purposes of tort liability, *see Smith*, 206 P. at 797, the court has not indicated that an independent contractor performing maintenance work for a common carrier may be held liable as a common carrier itself.

Generally, where common carriers hire independent contractors to perform work for them, the common carrier may still be held liable in certain instances for the negligence of the independent contractor. Specifically, an employer may be found negligent in "selecting, instructing, or supervising" the independent contractor or where the employer's duties that arise out of some relation toward the public cannot be delegated to the independent contractor.[4] Restatement (Second) of Torts § 409 cmt. b (1965). Because there is no case law in Nevada indicating that a common carrier may delegate its heightened duty of care to independent contractors,[5] the Court finds that Schindler, operating merely as an independent contractor, cannot be held liable as a common carrier.

### B.   Negligence

To prevail on a negligence claim under Nevada law, a plaintiff must establish four elements: (1) the existence of a duty of care, (2) a breach of that duty, (3) legal causation, and (4) damages. *Sanchez ex rel. Sanchez v. Wal-Mart Stores, Inc.*, 221 P.3d 1276, 1280 (Nev. 2009).

In its Motion, Schindler contends that no evidence exists to suggest that they breached their duty of care by negligently maintaining the elevator or that such a breach

///

---

[4]Schindler implicitly argues in its reply that the duty owed to Deatherage and other invitees to Harvey's was nondelegable and therefore rested solely with Harvey's. (*See* ECF No. 40 at 5-6.)

[5]In *Hughes*, the court found that the duty to ensure invitee safety is presumably nondelegable. In fact, the court stated that, under the nondelegable duty doctrine, "landowners cannot escape liability for the acts of their independent contractors with respect to the duty to maintain safe premises for invitees." *Hughes*, 2013 WL 1792172, at *5 n.3. Ostensibly, common carriers owe a duty of safety to their invitees, making that duty a nondelegable one.

1  proximately caused Deatherage's injuries. (*See* ECF No. 38 at 12.) The Court

2  disagrees. To rebut Deatherage's allegation that they negligently maintained the

3  elevator, Schindler points to evidence in the record to claim that they provided

4  maintenance at regular intervals (*see id.* at 4), conducted preventative maintenance

5  (*see id.*), and responded to service calls promptly. (*Id.* at 12-13.) For instance, Schindler

6  points to work performed on the elevator on April 5, 2014, wherein the technician

7  conducted testing of the "normal and final terminal stopping device, the safeties, the

8  ascending car overspeed protection and unintended car movement devices, and the

9  standby (or emergency) power." (*Id.* at 4; *see also* ECF No. 38-10 at 4 (2014

10  Maintenance Completion Report).) Schindler also claims that Deatherage has failed to

11  demonstrate that Schinder's purported negligent maintenance produced a "harmful,

12  non-code[6] compliant[7] condition" on the elevator at the time of the incident (*see* ECF No.

13  38 at 13).

14      In response, Deatherage relies heavily on its elevator expert to rebut Schindler's

15  assertions that it provided adequate preventative maintenance and that the "abrupt

16  stopping event" was code compliant.[8] Stabler's expert reports reasonably identified at

17  ///

18  ///

---

19  [6]The code the parties refer to is the American Society of Mechanical Engineers ("ASME") A17.1 Safety Code for Elevators and Escalators.

21  [7]Schindler appears to equate code compliance with a lack of negligence. However, they cite to no case law in support of code compliance being dispositive of the existence of negligence.

22  [8]Deatherage's elevator expert, Joseph Stabler ("Stabler"), produced two reports—on September 8, 2016 and on October 25, 2016. (ECF Nos. 38-15, 38-16.) In between the two reports, Stabler personally inspected the elevator, which had been modernized since the July 19, 2014, incident. (*See* ECF No. 40-1.) This modernization included the replacement of parts. Part of Deatherage's response alleges that Schindler spoliated evidence when it discarded the older parts during the modernization. (ECF No. 39 10-11.) He also contends that spoliation occurred when Schindler's employee, Rick Slater, erased the elevator's error codes right after the incident. (*Id.* at 10.) While it is unclear whether Schindler actually owned the parts that were replaced or had control over their fate, or whether Slater knew of the incident when erasing the codes (*see* ECF No. 40 at 11-12), because the Court denies summary judgment to Schindler on this claim it will not address the spoliation allegation.

6

least two causes[9] of the elevator's abrupt stop resulting from Schindler's negligent maintenance. First, just eight days before the incident, a Schindler technician identified that a contactor—which determines the speed at which the elevator ascends/ descends—needed to be replaced, yet there is no affirmative evidence in the record that replacement was performed (beyond Slater's deposition). (*See* ECF No. 38-17 at 42, 47.) According to Stabler, the record also demonstrated that Schindler did not perform any preventative maintenance on this controller in the 243 days leading up to the incident. (*Id.* at 19.) Second, because Schindler's 2012 full load test of the elevator demonstrated that the elevator was stopping in 14.5 inches instead of the code required 38 inches, Deatherage's testimony regarding an abrupt stop made it reasonably likely that the load weighing device malfunctioned when the emergency terminal stopping device was activated, causing it to perceive the elevator had a heavier load than it actually did and to brake more aggressively. (*See* ECF No. 38-17 at 12, 31-32, 47.) In its reply, Schindler contends that because there is no evidence that the load weighing or terminal stopping device malfunctioned prior to this incident, there is no proof that the two components were negligently maintained. (*See* ECF No. 40 at 9.) While Stabler is unable to say with absolute certainty which negligently maintained elevator component or combination of them were the precise cause of the abrupt stop that Deatherage claims caused his injuries, Stabler's reports and deposition testimony present sufficient evidence that may permit a jury to reasonably infer that Schindler's negligent maintenance resulted in the malfunctioning of one or more of these components. Thus, whether this evidence is sufficient to demonstrate a breach is a factual dispute that will need to be resolved by a jury.

In the alternative, Schindler states that even if a material question of fact exists regarding a breach, Deatherage has produced no evidence to suggest that Schindler's

---

[9]Deatherage's response identifies three specific components that were negligently maintained and led to the accident: the controller, the load weighing device, and the emergency terminal stopping device. (ECF No. 39 at 13-15.)

1  negligent maintenance of the elevator was the legal cause of the harmful condition that

2  led to Deatherage's injuries. (ECF No. 38 at 13.) Schindler relies exclusively on

3  Stabler's deposition testimony where he purportedly admitted that the stopping forces

4  generated by the elevator met the standards he claims that Schindler violated. (*Id.* at

5  14.) Yet, during Stabler's deposition, he indicated that his preliminary report did not

6  factor in the stopping force of the dynamic brake and that it instead factored in only the

7  force of the elevator's mechanical or machine break. (*See* ECF No. 38-17 at 7.) With

8  the mechanical brake only considered, the stopping force would be code-compliant, as

9  Stabler determined that this brake produced a peak G-force or 0.6g, which is below the

10 1g code requirement (or 2g code requirement when including the force of gravity). (*See*

11 ECF No. 39 at 15; *see also* ECF No. 38-17 at 34.) However, once Stabler realized that

12 the elevator also included a dynamic braking system that was activated during the

13 incident by the emergency terminal stopping device, he determined that, based on his

14 experience, the dynamic brake performed at about 0.7g. (ECF No. 39 at 15; ECF No.

15 38-17 at 9-10, 34.) Deatherage therefore claims that the two brakes worked in tandem

16 during the incident to create a stopping force slightly greater than 1g, which with the

17 addition of gravity at 1g was twice his body weight and 30 to 40 times greater than a

18 normal elevator stop. (ECF No. 39 at 15; *see also* ECF No. 38-16 at 6; *see also* ECF

19 No. 38-17 at 8-9, 42.) Ultimately, Stabler claims that this excessive stopping force was

20 the cause of Deatherage's injuries.

21      On a final note, Schindler relies on *Soldano v. United States*, 453 F.3d 1140 (9th

22 Cir. 2006), to argue that Stabler's expert opinion alone is insufficient to demonstrate that

23 the elevator was in an unsafe condition when Deatherage encountered it. (ECF No. 38

24 at 14.) However, the expert in *Soldano* did not base his decision on anything other than

25 his observation of the accident site four years later. By contrast, Stabler based his

26 opinion on a combination of: Deatherage and his nephew's deposition testimony;[10] the

[10]It appears that Schindler contests the existence of an abrupt stop as there is no evidence other than Deatherage and his nephew's deposition testimony that the abrupt
*(fn. cont…)*

1   record indicating that on July 11, 2014, the 201 contactor needed to be replaced without

2   any supplemental affirmative evidence indicating that it had been replaced (*see* ECF

3   No. 38-12 at 3); Schindler's 5-year full load safety test in 2012 where the elevator

4   reportedly stopped on its mechanical safeties in 14.5 inches instead of the required 38

5   inches required by A17.1, Rule 205.3 (*see* ECF No. 38-16 at 3); and the fact that the

6   controller and motor drive of the elevator had not been serviced since November 18,

7   2013 (*see* ECF No. 38-16 at 4), nor had the dynamic braking, contactors, delay timers,

8   and positioning terminal slow devices (ECF No. 38-17 at 19).

9          In sum, the Court finds that viewing the evidence, including Stabler's expert

10   reports and deposition testimony, in the light most favorable to Deatherage and drawing

11   all reasonable inferences in his favor, a reasonable jury may find that Deatherage

12   established both elements of breach of duty and causation,

13          **C.   Res Ipsa Loquitur**

14          "Res ipsa loquitur is an exception to the general negligence rule, and it permits a

15   party to infer negligence, as opposed to affirmatively proving it, when certain elements

16   are met." *Woosley v. State Farm Ins. Co.*, 18 P.3d 317, 321 (Nev. 2001). In Nevada, to

17   satisfy a claim under the doctrine of res ipsa loquitur, a plaintiff must show: "(1) the

18   event must be of a kind which ordinarily does not occur in the absence of someone's

19   negligence; (2) the event must be caused by an agency or instrumentality within the

20   exclusive control of the defendant; [ ] (3) the event must not have been due to any

21   voluntary action or contribution on the part of the plaintiff;" and (4) the defendant has

22   "superior knowledge of or [is] in a better position to explain the accident[.]" *Woosley*, 18

23   P.3d at 321.[11] Schindler contends that based on the facts, Deatherage cannot meet the

24   

25   *(…fn. cont.)*
    stop occurred. (*See* ECF No. 40 at 10.) Because the Court must view the evidence in
26   the light most favorable to Deatherage, the Court assumes the allegation of an abrupt
    stop to be true.

27          [11]The Nevada Supreme Court has held that, under the doctrine of res ipsa
    loquitur, an elevator passenger need not show that it was more probable than not that
28   the injuries sustained in an elevator accident resulted from a company's breach of duty
    *(fn. cont…)*

1   first, second, and fourth elements of *res ipsa loquitur*. (*See* ECF No. 38 at 10-12.)

2   However, the Court finds that Deatherage presents sufficient evidence regarding the

3   first, second, and fourth elements. Regarding the first element, Schindler disputes the

4   existence of a qualifying event because Stabler purportedly indicated during his

5   deposition that the stop occurred at a force in compliance with ASME A17.1. (ECF No.

6   38 at 11.) This, however, is a mischaracterization of Stabler's position during the

7   deposition. Stabler supplemented his initial report once he realized that the elevator

8   possessed a dynamic brake in addition to the mechanical brake and certain load

9   weighing switches.[12] (ECF No. 38-17 at 7-8.) Although he did not test the dynamic

10  braking system that existed at the time of the incident[13] (ECF No. 38-17 at 37), based

11  on his experience with this brand of elevator, the description Deatherage provided of the

12  incident,[14] and Deatherage's injuries, Stabler determined that both the mechanical

13  brake and dynamic brake were employed when the emergency terminal stopping device

14  was triggered after the power outage (id. at 35). Thus, Stabler's supplemental report

15  determined that the stopping force was, based on his October 11, 2016 testing of the

16  mechanical brake and his experience with dynamic brakes, approximately 1.2g, beyond

17  ///

---

18  *(…fn. cont.)*
    where the company manufactured and exclusively maintained the elevator, where the
19  accident was not normally one that would occur in the absence of negligence, and
    where the company was in a better position to explain the cause of the accident. *Otis
20  Elevator Co. v. Reid*, 706 P.2d 1378, 1380 (Nev. 1985).

21      [12]Stabler did not realize until after he produced his initial report that a company
    he had previously worked for performed maintenance and engineering on Harvey's
22  elevators and had provided him with the "documents for the subject elevators at the
    Harvey's Casino for the . . . time of installation." (ECF No. 38-17 at 7.)

23      [13]The dynamic braking system was replaced during the modernization of the
    elevator.

24      [14]To the extent that Schindler finds Deatherage's testimony not credible, without
25  any contradicting evidence the Court must assume for purposes of summary judgment
    that Deatherage's narrative of the elevator incident is what actually happened. In fact,
26  Deatherage provided reports from his physicians and an expert epidemiologist to
    corroborate that his injuries were triggered by the elevator incident. Moreover, there is
27  the incident report he originally filled out at the casino, the report of the Harvey's
    security officer, Carl Paulson, and the deposition of Deatherage's nephew Derek who
28  was riding in the elevator with him. (*See* ECF Nos. 39-12, 39-13, and 39-15.)

1    the code-compliant measure of 1g.[15] (ECF No 38-16 at 6; ECF No. 38-17 at 34.)

2    Moreover, while Deatherage had a preexisting back condition, there was no evidence

3    that he had suffered from any lower back pain related to that condition since March

4    2014 until immediately upon and after the incident. In fact, one of Deatherage's experts,

5    Dr. Michael Freeman, stated that "[t]he probability that he would have developed painful

6    symptoms of a recurrent disk herniation that purely coincided with the elevator incident

7    but on the same day would be . . . .1 in 24,455." (ECF No. 39 at 12; ECF No. 39-22 at

8    11.) Furthermore, Dr. Freeman stated that in spite of Deatherage's prior history of back

9    surgery, it was "highly improbable that [Deatherage] would have ever gone on to need

10   an additional surgery *at that level* in the absence of the trauma." (ECF No. 39-22 at 11

11   (emphasis added).) Because the Court must view the evidence in the light most

12   favorable to Deatherage, the Court finds that there is sufficient evidence that the

13   elevator's quick descent and abrupt stop would not have happened absent Schindler's

14   negligence.

15        Schindler contends that Deatherage fails to demonstrate the second element of

16   res ipsa loquitur because the "power outage/surge which precipitated Plaintiff's descent

17   was not within Schindler's exclusive control" and because Harvey's did not grant

18   Schindler control over the elevators but required Schindler to recommend (not make

19   ultimate decisions) regarding replacements, upgrades, or modernization of the

20   elevators. (ECF No. 38 at 11; ECF No. 40 at 7.) In response, Deatherage contends that

21   he is not attributing his injuries to the power outage/surge; rather, he attributes the

22   cause of his injuries to "how the elevator behaved in response to the power

23   interruption." (ECF No. 39 at 21.) Deatherage also points to the Nevada Supreme

24

25        [15]In his supplemental report, Stabler states that Deatherage more likely than not
     experienced "approximately 2g with gravity" of stopping force. (ECF No. 38-16 at 7.)

26   However, Stabler adds that this force was "followed by retardation peaks of
     approximately 0.6g over a time duration of approximately 400 milli-seconds." (*Id.*)

27   Seemingly relevant to this finding is an industry report that Stabler cites that describes a
     stop of less force and for a shorter duration as "extremely harsh and destabilizing." (*Id.*

28   at 6.)

1   Court's decision to uphold a jury instruction on res ipsa loquitur in *American Elevator*

2   *Co. v. Briscoe*, 572 P.2d 534, 535-6 (Nev. 1977), where a company had exclusive

3   contractual duty to service and maintain elevators in a hotel. (*Id.*) Schindler does not

4   aver in its reply that another company had additional control over the maintenance and

5   service of the elevators or that Harvey's itself employed an individual able to maintain or

6   service the elevators. Moreover, unlike the defendant in *Briscoe*, Schindler does not

7   contend that the elevator was improperly installed or manufactured. *See Briscoe*, 572

8   P.2d at 536. Because Deatherage is only required to produce sufficient evidence "from

9   which it can be said that it was more likely than not that it was negligence on part of his

10  adversary" that caused the elevator to abruptly stop, *see id.* at 537, the Court finds that

11  expert opinions in combination with the maintenance logs and deposition testimony

12  amounts to circumstantial evidence with sufficient probative force by which a jury may

13  reasonably infer negligence. *See Otis Elevator Co. v. Reid*, 706 P.2d 1378, 1381 (Nev.

14  1985) (internal citation omitted).

15      Finally, Schindler maintains that it does not have superior knowledge of the

16  subject incident because its mechanic, Rick Slater, was not aware of the incident when

17  he re-initialized the elevator and examined it on July 19, 2014. (ECF No. 38 at 12.)

18  Given Slater's lack of knowledge of the incident, it is reasonable that the service he

19  performed on that date was minimal. (*See* ECF No. 38-5 at 29.) However, Schindler, as

20  seemingly the only entity providing maintenance services to Harvey's elevators, was in

21  the best position to discern and explain why the elevator may have abruptly stopped or

22  to determine what further maintenance, if any, was needed. Instead, Schindler

23  apparently chose not to generate a report of the incident due to liability concerns after

24  Harvey's employee, Carl Paulson, followed up with them about the incident on July 21.[16]

25

26  ---
    [16]The Court abstains from determining the admissibility of this statement in
27  Paulson's report. At the summary judgment stage, the Court focuses only on the
    admissibility of the evidence's *contents* and not on the form that the evidence is
    presented in. *Fraser v. Goodale*, 342 F.3d 1032, 1036-37 (9th Cir. 2003) (internal
28  citation omitted) (emphasis added).

1   (ECF No. 39-12 at 10.) Moreover, the maintenance work report from 2014 shows that

2   work was performed on the elevator on July 22, 2014 (*see* ECF No. 38-10), at which

3   point Schindler would have been able to determine what issues, if any, could have

4   caused an abrupt stop.

5         **D.    Punitive Damages Award**

6         "Whether the record contains sufficient evidence to justify an award of punitive

7   damages is a question of law, and for the court to decide." *Austin v. C & L Trucking,*

8   *Inc.*, 610 F.Supp. 465, 472 (D. Nev. 1985) (citing *U.S. Fidelity v. Peterson*, 540 P.2d

9   1070 (1975)). Under Nevada law, to recover punitive damages a plaintiff has to show

10   that a defendant acted with "malice, express or implied." NRS § 42.005(1). "Malice"

11   means "conduct which is intended to injure a person or despicable conduct which is

12   engaged in with a conscious disregard of the rights or safety of others." NRS §

13   42.001(3). A court may infer the existence of malice where the defendant shows a

14   conscious disregard of an accepted safety procedure. *Leslie v. Jones Chemical Co.*,

15   551 P.2d 234 (1976).

16         Schindler asks this Court to dismiss Plaintiff's request for punitive damages given

17   that Deatherage "wholly fails to establish by any evidence that Schindler acted with

18   malice or any level of culpable intent." (ECF No. 38 at 15.) However, the Court finds that

19   Deatherage has presented sufficient evidence concerning Schindler's possible

20   conscious disregard of safety procedures to rebut this assertion. For instance, Stabler

21   testified that the record shows that Schindler's maintenance control program occurred

22   on a roughly semi-annual basis, yet the machine braking system and controllers should

23   have been dynamically tested, not merely visually inspected, every two weeks.[17] (*See*

24

25         [17]Stabler appears to base this "two week" standard on the elevator
manufacturer's original standards, industry standards at the time, and the contract

26   between Harveys' and Schindler (which required that preventative maintenance and
adjusting meet the original equipment manufacturer's standards (*see* ECF No. 39-2 at

27   20)). (ECF No. 38-17 at 27.) Deatherage also claims that Schindler's maintenance
control program for the elevator in question did not comply with Nevada law. (ECF No.

28   39 at 5.)

1  ECF No. 38-17 at 16-17, 21, 26, 29.) Moreover, the checklist developed by Schindler

2  itself was not adhered to on a regular basis; rather, it appears that certain visual checks

3  were performed at various intervals. (*See* ECF No. 39-7.) The record also shows that on

4  December 21, 2013, the elevator was reporting abrupt stops while "in flight" every thirty

5  to forty rides, requiring the replacement of two relays. (ECF No. 38-12 at 2.) Stabler's

6  supplemental report indicates that these abrupt stops are relevant because, "[g]iven that

7  [the elevator] stopped on its mechanical safeties in 14 [inches] on May 10, 2012, the

8  settings of the load-weighing switches were more likely than not compromised, which

9  explains in part why [the elevator] was stopping hard in flight intermittently ever 30-40

10  trips on December 21, 2013[,] and Mr. Deatherage's testimony that [the elevator]

11  abruptly dropped on July 19, 2014, as Schindler did not diagnose or correct the root

12  cause of the malfunctions."[18] (ECF No. 38-16 at 5.) While Schindler contends that the

13  cause of the hard trips was resolved based on Slater's deposition—Slater doesn't know

14  when he resolved the issue but would not have put the elevator back in service

15  otherwise (*see* ECF No. 38-5 at 20)—the Court refrains from evaluating the credibility of

16  Slater's testimony. Similarly, the record demonstrates that on July 11, 2014, Slater

17  determined that a contactor needed to be replaced, yet there is no evidence other than

18  Slater's general statement during his deposition that he would not have put the elevator

19  back in service until he ran it for a while and was convinced he had identified the

20  problem (*see* ECF No. 38-5 at 20, 21) that the component was replaced. The lack of

21  affirmative evidence in the record beyond Slater's deposition testimony presents a

22  ///

---

23  [18]An annotation of "unit requires more troubleshooting" was also made for December 21, 2013, yet there are no subsequent annotations that troubleshooting was
24  performed. (*See* ECF No. 38-12 at 2-3.) In Schindler's Motion, they assert that, "Although the elevator was reportedly experiencing 'hard stops' back in December
25  2013, these issues had appropriately been resolved with no such complaints in the eight (8) months prior to the incident." (ECF No. 38 at 4.) While it is correct that the record
26  does not include subsequent complaints of hard stops, the record does not indicate that the issue had "appropriately been resolved." Rather, the record indicates that two relays
27  had been replaced and that the elevator would not be in use "till Monday." (ECF No. 38-12 at 2.)

28

genuine issue of material fact as to whether the malfunction had been corrected or the contactor had been replaced.

Thus, the Court finds there is sufficient evidence in the record to deny summary judgment on Schindler's request to dismiss Deatherage's claim for punitive damages. However, the Court's ultimate determination of whether an instruction on punitive damages will be given to the jury will depend on the evidence presented at trial and whether the jury finds Schindler liable for Deatherage's injuries.

**V.    CONCLUSION**

The Court notes that the parties made several arguments and cited to several cases not discussed above. The Court has reviewed these arguments and cases and determines that they do not warrant discussion as they do not affect the outcome of Schindler's Motion.

It is therefore ordered that Schindler's Motion for Summary Judgment is denied as to Deatherage's negligence and res ipsa loquitur claims and as to Deatherage's request for punitive damages. The Motion for Summary Judgment is granted as to Deatherage's claim for common carrier negligence.

DATED THIS 24th day of July 2017.

MIRANDA M. DU
UNITED STATES DISTRICT JUDGE